UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Christina E. Mattison,

        Plaintiff,

        v.                                     Civil Action No. 2:10-CV-325

Michael J. Astrue,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
(Docs. 10, 21)

Plaintiff Christina Mattison brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. Pending before the Court are Mattison's motion to reverse the Commissioner's decision (Doc. 10), and the Commissioner's motion to affirm the same (Doc. 21). For the reasons stated below, I recommend that Mattison's motion be DENIED, and the Commissioner's motion be GRANTED.

## Background

Mattison was twenty-eight years old on the alleged disability onset date of October 15, 2003. (AR 21-23, 130.) She has a high school education, and has taken some college courses in child development. (AR 23, 140.) She has work experience as a personal care attendant for elderly persons and a housekeeper, and has also worked with disabled children and in a daycare setting. (AR 23, 33, 136, 150.) Mattison is married and has

two children who were approximately four and six years old, respectively, on the date of the administrative hearing in this matter.  (AR 25, 36, 210, 214.)

On September 26, 2008, Mattison filed an application for disability insurance benefits alleging a disability onset date of October 15, 2003.  (AR 107-10.)  She was last insured for benefits on June 30, 2007.  (AR 21-22, 51.)  Mattison claims that she has "not worked much" since 2000 (AR 135), and has been unable to work since the alleged disability onset date, due to severe depression, anxiety, and panic disorder.[1]  (AR 23-24, 130, 135.)  She states that her anxiety "makes it very hard for [her] to go places that [she] ha[s] never been"; she "cannot take much stress or noise"; and she has panic attacks "if things are not mellow."  (AR 135.)  She further states that her vision is impaired; she has sleeping problems; and she has "horrible" headaches.  (*Id.*)  At the administrative hearing, Mattison testified that, between 2004 and 2007, her depression caused her to have such "little energy" that she was unable to get out of bed and function.  (AR 29-30.)

Mattison's application was denied initially and on reconsideration.  (AR 46-53.) On August 9, 2010, Administrative Law Judge ("ALJ") Thomas Merrill conducted a hearing on the application.  (AR 19-45, 631-32.)  Mattison's husband, Flynn Mattison, testified at the hearing (AR 35-42), as did vocational expert ("VE") John Bach (AR 42-45, 631-32.   On August 20, 2010, the ALJ issued a decision finding that Mattison was not disabled.  (AR 7-13.)  A few months later, the Decision Review Board affirmed that decision, making it final.  (AR 1-3.)  Having exhausted her administrative remedies,

---

[1]  Puzzlingly, in her DIB application paperwork, although Mattison states that she "became unable to work because of [her impairments]" on "10/15/2003," she also states that she did not "stop working" until almost two years later, on "09/15/2005."  (AR 135.)

Mattison filed the Complaint in this action on December 29, 2010.  (*See* Doc. 1.)

## ALJ Determination

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's "residual functional capacity" ("RFC") precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The fifth and final step requires the ALJ to determine whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that burden shift to Commissioner at step five is limited, and Commissioner

"need not provide additional evidence of the claimant's residual functional capacity").

Employing this sequential analysis, ALJ Merrill first determined that, although Mattison worked after the alleged disability onset date, this work did not rise to the level of substantial gainful activity, and thus Mattison had not engaged in substantial gainful activity since her alleged disability onset date of October 15, 2003.  (AR 9.)  At step two, the ALJ found that, through the date last insured ("DLI") of June 30, 2007, Mattison had the following medically determinable impairments: "social anxiety disorder and chronic depression."  (*Id.*)  However, the ALJ found that these impairments, individually and in combination, did not significantly limit Mattison's ability to perform basic work-related activities for twelve consecutive months, and thus Mattison "did not have a severe impairment or combination of impairments."  (AR 10.)  The ALJ concluded that Mattison had not been under a disability from the alleged onset date through the DLI.  (AR 12.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

Although the reviewing court's role with respect to the Commissioner's disability decision is "quite limited[,] and substantial deference is to be afforded the Commissioner's decision," *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quotation marks and citation omitted), the Social Security Act "must be construed liberally because it is a remedial statute that is intended to include, rather than exclude, potential recipients of benefits," *Jones v. Apfel*, 66 F. Supp. 2d 518, 522 (S.D.N.Y. 1999); *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981) ("In its deliberations the District Court should consider the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied.").

**Analysis**

## I.     ALJ's Severity Determination

Mattison argues that the ALJ erred in concluding that she did not suffer from a

severe impairment during the alleged disability period (October 2003 through June

2007).[2]   The regulations define a "severe" impairment as one "which significantly limits

[the claimant's] physical or mental ability to do basic work activities."   20 C.F.R. §

404.1520(c); *Meadors v. Astrue*, 370 F. App'x 179, 182 (2d Cir. 2010).   The Social

Security Administration has described the claimant's burden of demonstrating a "severe"

impairment as follows:

> [A]t the second step of [the] sequential evaluation it must be determined
> whether medical evidence establishes an impairment or combination of
> impairments "of such severity" as to be the basis of a finding of inability to
> engage in any [substantial gainful work].   An impairment or combination of
> impairments is found "not severe" and a finding of "not disabled" is made
> at this step when medical evidence establishes only a slight abnormality or
> a combination of slight abnormalities which would have no more than a
> minimal effect on an individual's ability to work even if the individual's
> age, education, or work experience were specifically considered (i.e., the
> person's impairment(s) has no more than a minimal effect on his or her
> physical or mental ability(ies) to perform basic work activities).

SSR 85-28, 1985 WL 56856, at *3 (1985).

Here, the ALJ justified his determination that Mattison's mental impairments,

including her anxiety and depression, were not severe prior to the DLI, by making the

---

[2]    In her Reply, Mattison argues that "[t]he Commissioner spends much of her time pointing out
events or notations in the medical record prior to 2005[, but] *[t]he time period prior to 2005 is not critical
to determining whether Mr. Mattison is eligible for benefits*.   The critical time period is 2005 through
June 30, 2007, the [DLI]."  (Doc. 24 at 1 (emphasis added).)   Regardless of what period of time is
"critical," the alleged disability period remains October 13, 2003 through June 30, 2007.   Therefore,
evidence from the period between October 13, 2003 and 2005 is relevant for purposes of the Court's
review of the ALJ's decision.

following principal findings: (a) it was unclear whether Mattison's husband's testimony at the administrative hearing related to the relevant timeframe (AR 11); (b) during the insured period, Mattison had managed her home and cared for two young children without reporting significant difficulties to her therapist (*id.*); (c) Mattison had not required inpatient care prior to her September 2008 hospitalization, which was over a year after the DLI (*id.*); (d) Mattison had gone camping and fishing immediately before the alleged disability onset date, and had taken multiple trips, including to Italy and Florida, during the alleged disability period (AR 11-12); and (e) Mattison had worked at a friend's daycare for thirty to thirty-five hours per week in 2004 and 2005, and had worked to some extent in 2006 and 2007 (*id.*).  The record substantially supports these findings, as discussed below.

First, although Mattison's counsel stated at the administrative hearing that he wanted to "focus on the time period between 2004 and 2007" (AR 35), most of Mattison's husband's testimony was given in the present tense (AR 36-42), indicating that Mr. Mattison was referring to his wife's condition on the date of the administrative hearing, which was over three years after the DLI.  For example, Mr. Mattison testified that "the situation *now*" was that his sister-in-law came to the house to help take care of the kids, or he could send the kids to her house if necessary.  (AR 38 (emphasis added).) In fact, Mattison's own testimony was also given mostly in the present tense, making its reliability questionable with respect to her condition during the alleged disability period as opposed to after the DLI and at the time of the administrative hearing.  (*See, e.g.,* AR 27 ("[B]oth of [my children] have been going to preschool and I have a girl who watches

7

them three days a week for me."); AR 28 ("Sometimes I . . . ask if the girl can come and watch [the children]."). )[3]

Second, the record demonstrates that, during the insured period and after the birth of her first son in 2004, Mattison "[e]njoy[ed] being a mom"; and although she was exhausted and experienced anxiety and depression, she was able to get "back in[to] the workforce" while also caring for her son. (AR 210; *see* AR 317.) Mattison fails to reference any evidence, other than her and her husband's testimony years after the relevant period, which indicates that she was unable to care for her children on or before the DLI. Even her own function report, which she prepared on November 16, 2008, approximately seventeen months after the DLI and much more contemporaneous to the insured period than her testimony at the August 9, 2010 administrative hearing, supports the ALJ's finding that Mattison was able to care for her children during the alleged disability period. (AR 142-49.) Specifically, in that report, Mattison did not mention a caregiver coming to her house to help with the children, but rather, reported that her daily activities included preparing her four- and two-year old sons for preschool (which she later testified went from 9:00 a.m. until 1:00 p.m. (AR 27)), sometimes shopping for groceries, and doing the laundry. (AR 142.) She further reported that, although her husband "help[ed]" with the children from 3:30 p.m. until bedtime on weekdays and all the time on weekends, she bathed the children and prepared breakfast and lunch for

_____

[3] Mattison asserts that she received assistance for the care of her children from BECCA, which she claims "aides families in need." (Doc. 10-1 at 14.) But there is no indication in the record that she received such assistance during the insured period. Rather, the record merely reveals that Mattison was receiving "family support through BECCA" approximately in April 2009, almost two years after the DLI. (AR 508.)

them.[4]  (AR 143-44.)  This reporting conflicts with Mattison's testimony at the administrative hearing that she "ha[s] a girl who watches [the children] three days a week" (AR 27), seemingly indicating that Mattison's ability to care for her children had deteriorated between the DLI and the date of the administrative hearing.  Moreover, as noted by the ALJ (AR 11), the counseling records of Mattison's treating psychiatric nurse practitioner, Ana Rosales, R.N., M.S., C.N.S., P.N.P. (AR 568), who treated Mattison for depression and anxiety since 1999 and through the insured period, demonstrate that *during the insured period* Mattison was able to function, although she required medication and counseling to manage her sometimes serious depression and anxiety. (*See, e.g.,* AR 214, 215.)

Third, the ALJ accurately noted that Mattison "had not required any inpatient care" prior to her August/September 2008 hospitalization after the first of two suicide attempts.[5]  (AR 11.)  Noteworthy, this hospitalization – which reflects a deterioration in Mattison's mental condition and an episode of decompensation – occurred over one year after the June 2007 DLI.  (AR 192-204.)  None of the medical records arising from the August/September 2008 hospitalization retrospectively connect Mattison's condition at that time with her condition over a year earlier, and the record taken as a whole does not demonstrate that Mattison's condition was at the same level of severity on or before the DLI as it was when she was hospitalized for attempted suicide in 2008.

---

[4]  A December 2006 counseling note from Mattison's treating counselor, Ana Rosales, states that, although Mattison experienced anxiety and felt she was not a good housewife, she was "tak[ing] care of [her two children, ages two and five-months old,] full-time."  (AR 213.)  Much of the remainder of this note is illegible, as are many of Rosales's other handwritten notes.

[5]  Mattison was hospitalized again in April 2009 after a second suicide attempt.  (AR 522-23.)

Finally, the ALJ accurately noted that the record revealed Mattison's reporting that she had a good time on a two-week vacation with her husband in Italy and vacationed in Florida during the alleged disability period.  (AR 11-12; *see* AR 208, 228, 369.)  Also, the ALJ correctly noted that the record reflected Mattison working at a friend's daycare for thirty to thirty-five hours per week in 2004 and 2005.  (AR 11; *see* AR 210, 370.)  Rosales's treatment notes from November 11, 2004 support this finding, stating: Mattison is "now working 30 [to] 35 [hours] / week [at] her friend's daycare.  At night, she is trying to keep up with the housework [and] still nursing the baby."  (AR 210.)  Likewise, notes from Mattison's treating physician Dr. Barbara Raskin from around the same time period state: "works 35 hours a week."  (AR 370.)  Although Dr. Raskin noted that Mattison suffered from fatigue and "need[ed] to pay more attention to basics of regular, healthy meals, [increase] water/fluids, [and] improve sleep," she stated that Mattison's spirits were "good" and her depression was "stable."  (*Id.*)

The ALJ also based his severity determination on the medical opinions of agency psychiatric consultant Dr. Joseph Patalano, to which he afforded "great weight."  (AR 12.)  In January 2009, Dr. Patalano opined that, "during the rating period," Mattison's depression and anxiety were stable and "for the most part" well-managed with medication.  (AR 298.)  He further opined that there was no evidence that Mattison had a severe psychiatric impairment, and that her mental condition "deteriorated after the rating period with retreat admission in 8/31/08 with overdose and subsequent [diagnosis] of major depression."  (*Id.*)  Dr. Patalano noted that, although the opinions of Mattison's "longstanding PCP and psychologist" supported a finding of severity, those opinions

10

were "outside [the] rating period considered [in this matter]."  (*Id.*)

The record – including the opinions of agency consultants Drs. Arthur Lewy, William Farrell, and John Gambill, each of whom conducted an independent review of the evidence (AR 300-02, 582, 584-86) – supports Dr. Patalano's opinions.  Specifically, with respect to the worsening of Mattison's mental condition just prior to her August 2008 hospitalization, by Mattison's own admission, the record reveals that, on average, before the hospitalization, she met with Rosales approximately once every one-to-three months.  (*See* Doc. 24 at 2 (citing AR 317-22).)  But after the hospitalization, she began treating with psychologist Dr. Marjorie LaRowe on a twice weekly basis (AR 276, 409-14), and met with Rosales on a more frequent basis than previously (AR 215-23).  Even Rosales's treatment notes from the insured period (AR 208-13, 317) support Dr. Patalano's opinions, despite Rosales's later opinion (discussed in detail below) that Mattison was unable to work (AR 419).

Mattison asserts that Dr. Patalano's statement that Mattison's condition was well-controlled by Zoloft and ~~Clonazepam~~ clonazepam is not consistent with the medical record.  (Doc. 10-1 at 18.)  But, as noted above, Dr. Patalano actually stated that these medications managed Mattison's symptoms "*for the most part*" "*during the rating period*."  (AR 298 (emphasis added).)  The only record cited by Mattison to demonstrate the inconsistency between Dr. Patalano's statement and the medical record is a January 2009 letter from Rosales to Dr. Raskin which lists medications that Mattison was prescribed "between 2007 & 2008."  (AR 280.)  The letter does not specify if any of the listed medications was prescribed during the rating period, i.e., between October 2003

11

and June 2007.  Moreover, even if Mattison was prescribed medications other than Zoloft and Clonazepam during the rating period, the record still demonstrates (as discussed above) that Mattison's mental impairments were not functionally debilitating during that period.

In fact, there are no medical records which indicate that Mattison's mental impairments affected her ability to function on or before the DLI.  Regarding opinion evidence, although Dr. Raskin, Dr. LaRowe, and Rosales all opined that Mattison was unable to work on a full-time basis, all of these opinions were prepared over a year after the DLI and use the present tense, and none of them effectively relates back to the insured period.[6]  (*See* AR 225, 276, 419, 568-81, 624.)  To the contrary, Dr. LaRowe's opinion explicitly applies only as of the date it was prepared, December 15, 2008, over a year after the DLI.  (AR 276.)  The opinion states: "In my professional opinion, *at this time*, [Mattison] is unable to work due to severe depressive symptoms . . . ."  (*Id.* (emphasis added).)  Moreover, Dr. LaRowe did not even begin seeing Mattison until over a year after the DLI, in September 2008.  (*Id.*)  In support of her claim, Mattison quotes portions of Dr. Frederick Engstrom's hospital discharge notes which diagnose Mattison with major depressive disorder and assign low GAF scores to her.  (Doc. 10-1 at 9-10.)  But again, these notes were prepared in September 2008, over a year after the DLI, and they do not contain a retrospective component connecting Mattison's condition at that time with her condition during the insured period.  (AR 202.)  Furthermore, like Dr.

---

[6] Rosales's opinions are discussed in detail below, particularly with respect to whether her April 2009 opinion (AR 419) effectively relates back to the insured period.

LaRowe, Dr. Engstrom had not treated Mattison during the insured period.

In sum, the ALJ sufficiently explained his severity determination, and the record substantially supports his finding that, *on or before the DLI*, Mattison's mental impairments had no more than a minimal effect on her ability to work.  The ALJ's decision reflects that, in making his final determination, the ALJ properly assessed the record as a whole.

**II.    ALJ's Consideration of Rosales's Opinions**

Mattison contends that the ALJ failed to afford the proper weight to the opinions of her long-standing treating psychiatric nurse, Ana Rosales.  As noted above, Rosales treated Mattison since March 1999, through the alleged disability period, and thereafter.  On April 14, 2009, Rosales opined as follows:

> [Mattison] *has not been able to work since 6/04* due to severe depression, panic disorder, severe anxiety, and insomnia.  She was hospitalized at Brattleboro Retreat in 9/08 for an overdose due to major depression.  She has since been diagnosed with Bipolar Disorder, depressed type.  She is currently in treatment for counseling with Marjorie LaRowe, Ph.D. and medication therapy with me.

(AR 419 (emphasis added).)  Approximately two weeks later, in response to Interrogatories submitted by Mattison, Rosales opined that Mattison had marked difficulties in several areas of functioning as a result of her bipolar disorder, panic disorder, anxiety disorder, avoidant personality disorder, and borderline personality disorder.  (AR 568-81.)  The ALJ gave "little weight" to Rosales's opinions, explaining that: (a) she is not an "accepted medical source"; (b) her opinions are "not identified as specific to the period in question"; and (c) her opinions are "not supported" by her own

therapy notes.  (AR 12.)

As a registered nurse and not a licensed physician or psychologist, Rosales is not an "acceptable medical source," 20 C.F.R. § 416.913(a), and thus the ALJ's statement that Rosales was not an "accepted medical source" was accurate.  Nonetheless, the Social Security Administration has determined that opinions from sources other than "acceptable medical sources" are "important" and "should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file."  SSR 06-03p, 2006 WL 2329939, at *3 (2006).  Thus, while the ALJ was free to decide that Rosales's opinions were not entitled to any weight, or were entitled to only minimal weight, he should have explained that decision.  *See Marziliano v. Sullivan*, 771 F. Supp. 69, 75 (S.D.N.Y. 1991) (holding that opinion of "other source" is entitled to "some consideration").  The ALJ did in fact explain his decision to give little weight to Rosales's opinions; the issue is whether such explanation was legally proper and supported by substantial evidence.

The ALJ's statement that Rosales's opinions are "not identified as specific to the period in question" (AR 12) is not factually correct.  Although no time period is specified in Rosales's responses to Mattison's Interrogatories, her April 2009 letter *does* specify a time period, stating:  "[Mattison] has not been able to function and work *since 6/04* due to depression . . . ."[7]  (AR 419 (emphasis added).)  I find, however, that the ALJ's error is harmless for several reasons.  First, the only retrospective component of Rosales's opinion letter is the above statement that Mattison "has not been able to function and

---

[7] The rest of this sentence is illegible in the record.  (*See* AR 419.)

work" since June 2004.  (*Id.*)  However, "the ultimate determination of whether a claimant is disabled under the Social Security Act is 'reserved to the Commissioner.'" *Giunta v. Comm'r of Soc. Sec.*, No. 10-4869-cv, 2011 WL 5868419, at *1 (2d Cir. Nov. 23, 2011) (quoting 20 C.F.R. § 404.1527(e)(1)).  Thus, the ALJ could not have attached any special significance to this portion of Rosales's opinion, and it would have been proper for him to have rejected this portion of Rosales's opinion on these grounds.

Second, Rosales has not included any explanation in her opinion, and none can be found in her treatment notes, as to why she chose June 2004 as the onset date of Mattison's disability.  Even Mattison herself selected a different date, alleging in her DIB application and at the administrative hearing that her disability onset date was October 15, 2003 (AR 23-24, 107-10, 135) and refraining from subsequently amending that date.

Third and most importantly, Rosales's own treatment notes do not support a finding that Mattison was disabled beginning in June 2004.  Rather, as discussed above and in the ALJ's decision, those notes indicate that, during the insured period, although Mattison suffered from fatigue, anxiety, and depression; she was able to manage her home, care for her two young children when they were not at preschool and when her husband was not around, take vacations with her husband, and work up to thirty-five hours per week.  (*See, e.g.,* AR 192-204, 208, 210, 214-15, 370.)  In support of her April 2009 opinion, Rosales cites only to medical evidence dating back to September 2008, *over a year after the DLI*, when Rosales was hospitalized after her first suicide attempt. Specifically, Rosales's opinion letter states:  "[Mattison] was hospitalized [at] Brattleboro Retreat in 9/08 . . . .  She has since been diagnosed with bipolar disorder . . . ."  (AR 419.)

15

As discussed above, the record demonstrates that, by the time of her August/September 2008 hospitalization, Mattison's condition had deteriorated from what it had been during the insured period.  The Second Circuit has held that the retrospective opinion of a treating source "must be evaluated in terms of whether it is predicated upon a medically accepted clinical diagnostic technique and whether[,] *considered in light of the entire record*, it establishes the existence of a[n] . . . impairment *prior to [the DLI]*." *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981) (emphases added) (internal quotations omitted).  In this case, I find that the record taken as a whole, including Rosales's contemporaneous treatment notes, does not support Rosales's opinion that Mattison was unable to work since June 2004.

With respect to Rosales's other opinions, which are contained in her responses to Mattison's Interrogatories, the ALJ was not required to afford more than "little weight" to them.  Like the opinions of Drs. Raskin and LaRowe, there is no reference therein to the insured period.  A retrospective opinion may be used to support the existence of a disability only when that opinion clearly refers to the disability period and not when the opinion "simply express[es] an opinion as to the claimant's current status."  *Vitale v. Apfel*, 49 F. Supp. 2d 137, 142 (E.D.N.Y. 1999) (citing *Jones v. Sullivan*, 949 F.2d 57, 59-60 (2d Cir. 1991)).  Here, not only does Rosales's opinion fail to reference the relevant period, but in support of such opinion, Rosales refers only to Mattison's September 2008 and April 2009 psychiatric admissions, the least contemporary of which occurred over one year after the DLI.

Finally, Mattison asserts that, on the question of the severity of Mattison's

impairments, Rosales's opinions are entitled to greater weight than those of agency

consultant Dr. Patalano, given that Rosales was a treating source whereas Dr. Patalano

was not.  (Doc. 10-1 at 17.)  However, Social Security Ruling 96-6p clearly permits ALJs

to give more weight to the opinions of non-examining agency consultants than to those of

treating sources, when the former are supported by evidence in the record and the latter

are not.  SSR 96-6p, 1996 WL 374180, at *3 (1996) ("In appropriate circumstances,

opinions from State agency . . . consultants . . . may be entitled to greater weight than the

opinions of treating or examining sources."); see 20 C.F.R. § 404.1527(f)(2)(ii) ("State

agency . . . psychological consultants . . . are highly qualified . . . medical specialists who

are also experts in Social Security disability evaluation . . . .").  I find that the record –

including the medical evidence, as well as Mattison's self-reporting and the testimony of

Mattison and her husband at the administrative hearing – supports the opinions of Dr.

Patalano over those of Rosales.[8]  Thus, I find that substantial evidence supports the ALJ's

decision to afford "great weight" to Dr. Patalano's opinions and "little weight" to

Rosales's.  (AR 12.)

---

[8] Also noteworthy, as pointed out by the Commissioner, Dr. Patalano's opinions are supported by those of three other agency consultants, Drs. Lewy, Farrell, and Gambell.  (AR 300-02, 582, 584-86.)  Dr. Gambell accurately noted: "[I]n spite of the chronic depression and anxiety, [Mattison] was able to care for her young children and travel to Florida.  There is no evidence she was incompetent to care for her children during the rating period . . . ."  (AR 585.)  And Dr. Farrell correctly stated: "During the rating period, [Mattison] was more functional than [N]urse Rosales has concluded."  (AR 582.)

## Conclusion

For these reasons, I recommend that Mattison's motion (Doc. 10) be DENIED, and the Commissioner's motion (Doc. 21) be GRANTED.

Dated at Burlington, in the District of Vermont, this 8th day of December, 2011.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation. *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).